**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**George TERZADO–MADRUGA,**
**Defendant–Appellant.**

**No. 89–8063.**

United States Court of Appeals,
Eleventh Circuit.

April 2, 1990.
Rehearing Denied May 11, 1990.

Jon May, Miami, Fla., Richard A. Hamar, Hamar & Hamar, Los Angeles, Cal., for defendant-appellant.

J. Michael Faulkner, Asst. U.S. Atty., Savannah, Ga., for plaintiff-appellee.

Before TJOFLAT and HATCHETT, Circuit Judges, and MORGAN, Senior Circuit Judge.

MORGAN, Senior Circuit Judge:

Following a jury trial, defendant George Terzado–Madruga ("Terzado") was convicted of possession with intent to distribute cocaine, in violation of 21 U.S.C. Sec. 841(a)(1), conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. Sec. 846, and violation of the Travel Act, 18 U.S.C. Sec. 1952. The defendant appeals, alleging the following grounds for reversal: (1) prosecutorial misconduct which resulted in illegally obtained evidence being admitted at trial; (2) the improper admission of highly inflammatory evidence concerning defendant's participation in the drug conspiracy; (3) the district court's erroneous reinstruction to the jury regarding the elements of conspiracy; (4) the district court's improper reliance upon certain criminal acts and a prior criminal conviction to enhance defendant's sentence. We affirm.

## BACKGROUND

On March 31, 1988, a Georgia State Patrol officer stopped a vehicle for speeding on Interstate 95 in Bryan County, Georgia. The vehicle was being operated by Helen Villar, a resident of Miami, Florida. Her father, Rafael Villar, was a passenger in the vehicle. The patrolman determined that the vehicle, a 1985 Pontiac Grand Prix, was registered to Rafael Ortiz in Miami, Florida. Nervousness and conflicting stories regarding their intended destination caused the officer to seek and obtain a written consent to search the vehicle. During the search, two Georgia State Patrol officers discovered a secret compartment in the trunk which was operated by a concealed electronic switch. Approximately five kilograms of high-grade cocaine were found in the compartment.

After the discovery of cocaine, the Villars agreed to cooperate with the government investigators. The Villars advised the agents that they had previously transported cocaine for Terzado and that Terzado had furnished the drug-laden vehicle on this occasion. With the Villars' consent, the agents recorded several phone conversations in which the Villars pretended that their vehicle had developed transmission trouble. Terzado was recorded telling the Villars to "make sure the car is safe" and agreed to send money for repairs to the car. After inquiring as to the cost of having the vehicle towed to Washington, D.C., Terzado, using a false name, wired

$2,000.00 to Helen Villar in Savannah, Georgia.

Following these conversations, Terzado and three companions traveled by plane from Fort Lauderdale, Florida, to Savannah, Georgia, rented a car, and drove to the Villars' motel. Terzado paid for the airline tickets and for the car rental in cash. Upon his arrival at the motel during the early morning hours of April 1, 1988, Terzado was identified by the Villars and arrested. He had no identification on his person but was carrying an envelope on which was written, "Are you in trouble with the police?"

Shortly following Terzado's arrest, the agents found his three companions—Orlando Ortiz, Rafael Ortiz, and Rosemarie Zahriyeh—sitting in a rental car in the motel parking lot. These individuals were also charged with drug related offenses. Included among the items seized from the rental car was a set of keys to the vehicle driven by the Villars and $3,000.00 cash. The charges against these three individuals were later dismissed.

On April 7, 1988, a federal grand jury in the Southern District of Georgia returned an indictment charging Terzado with possession with intent to distribute cocaine (Count One), conspiracy to commit that offense (Count Two), and traveling in interstate commerce to facilitate a business enterprise involving the distribution of cocaine (Count Three). After conducting a detention hearing, the magistrate determined that Terzado presented a demonstrable danger to the community and that no conditions of release would reasonably assure community safety. Accordingly, the magistrate entered an order directing that Terzado be detained pending trial.

After federal charges were filed against Terzado, the investigating agents received information from the Miami Police Department regarding Terzado's drug trafficking and "gang" activities. In late April, Drug Enforcement Agency Special Agent Larry Frye and Georgia Bureau of Investigation Special Agent Dan Drake were informed by Miami police officer Jose Alvarez that several informants had indicated that Terzado "had placed a hit" on an individual named David Nadal, a former "lieutenant" in Terzado's gang. According to police information, David Nadal had been accused by Terzado of stealing substantial quantities of Terzado's cocaine and, sometime later, had been shot. Nadal, who survived the shooting, later informed the Miami police that he though Terzado had ordered the "hit" on him. The agents received additional information from Victor Gonzalez, that in late November or early December 1987, Terzado had offered him $10,000.00 to perform a drive-by shooting of Nadal and Danny Gonzalez, another former associate of Terzado.

On May 5, 1988, an individual named Jose Jiminez ("Joey") was arrested in Miami for his suspected involvement in the shooting of an individual named Adolfo Damian Cabrerra ("Mosquito") in December 1987. Prior to Joey's arrest, officer Alvarez had been advised by an informant that Joey had previously served as a body guard for Terzado. Following his arrest, Joey confessed to the shooting of Mosquito and reluctantly agreed to cooperate. Joey informed the police that Terzado had on several occasions stated that he wanted Nadal killed and had asked Joey to carry out the murder. Joey further informed the agents that on other occasions Terzado had asked if he would "take care of" Danny Gonzalez. Although these conversations with Terzado apparently took place prior to the attempt on Nadal's life, Joey also advised the officers that in his most recent conversation with Terzado—who was in jail following his arrest in Georgia—Terzado had asked how "Danny" (Gonzalez) was doing and again expressed an interest in retaliating against Gonzalez because of his perceived threat to Terzado. After interviewing Joey on May 5, officer Alvarez immediately contacted Special Agents Frye and Drake and advised them of the information he had received regarding Terzado's continuing plans to murder a potential government witness.

Upon receiving this information, federal and state authorities embarked upon a joint investigation to gather additional information regarding Terzado's previous efforts

to contract for the murders of David Nadal and Danny Gonzalez, and to determine whether Terzado was presently engaged in an attempt to commit murder. In an effort to document the murder plot and prevent any such crime, the agents secured Joey's cooperation in recording his telephone conversations with Terzado. The agents instructed Joey not to initiate any conversations with Terzado about murdering Danny Gonzalez, but simply to "follow along" should Terzado make any reference to such a scheme. The agents also told Joey not to discuss any past drug dealings or pending charges against Terzado. The agents then recorded a series of telephone conversations between Joey and Terzado, Terzado's supposed "common-law" wife, Brunilda Gonzalez, and an individual named "Cosmo."

The recordings were highly incriminating to Terzado. During the first recorded conversation with Joey on May 7, Terzado indicated at the outset that he had tried to reach Joey the previous day. Terzado explicitly asked Joey how much it would cost to have Danny Gonzalez "lose his air." During these discussions, Terzado made clear that he wanted it "to look like an accident." After indicating that he wanted Danny Gonzalez "runned [sic] over crossing the street," Terzado stated that "if it's too difficult that way," then Gonzalez should be shot "in the testicles[,] in the stomach, two or three [times]." Terzado was emphatic that, regardless of the method employed, "it has to be lights out so that he doesn't talk any more." After discussing payment terms, Terzado indicated that he would speak with "Brunilda [Gonzalez] ... so that she can have everything ready." Terzado also cautioned Joey to "wear a mask" and stated that "you can't leave any evidence whatsoever." In subsequent conversations, Terzado indicated that he had already spoken with Brunilda and arranged to have her deliver the nine millimeter handgun (a "nine") and the payoff money. Shortly after these conversations, Brunilda Gonzalez did in fact deliver to Joey a nine millimeter pistol and his expense money.

Danny Gonzalez was contacted by the police and agreed to allow the police to simulate gunshot wounds with makeup and take a photograph in which it would appear that he had been shot and killed as Terzado requested. After Brunilda was shown the staged photograph proportedly taken after Danny Gonzalez had been killed, she stated "I knew [the target] was David or Danny." Brunilda later paid Joey approximately $4,700.00 for the "murder." After her arrest by Miami police on June 6, 1988, Brunilda admitted giving Joey the gun and paying him for the murder of Danny Gonzalez.

On June 7, 1988, a superseding indictment was unsealed charging Terzado in three new counts with violations of the Murder-for-Hire Statute, 18 U.S.C. Sec. 1952 (Counts Four–Six). Brunilda Gonzalez was added as a defendant and charged with conspiracy to possess with intent to distribute cocaine (Count Two), and with use of interstate telephone facilities in commission of a murder-for-hire scheme (Count Six). At the time of this indictment, both defendants were also facing a state prosecution in Florida arising from an information charging them with conspiracy to commit first degree murder and attempted murder.

On August 15, 1988, the magistrate recommended that the murder-for-hire counts (Counts Four–Six) be severed from the drug-related counts (Counts One–Three), in order to satisfy *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). He further recommended that the trial of Brunilda Gonzalez be severed from that of Terzado due to their antagonistic defenses. The district court adopted the magistrate's report and recommendation.

On the eve of her trial, Brunilda Gonzalez pled guilty to Count Six and agreed to testify against Terzado. On August 18, 1988, after a three day jury trial, Terzado was convicted of Counts One through Three. Following a sentencing hearing, Terzado was sentenced to 380 months in prison. The murder-for-hire counts, Counts Four through Six, were later dismissed. This appeal followed.

## DISCUSSION

### A. *Prosecutorial Misconduct*

Appellant's first argument is that the government engaged in a number of acts which singly and collectively resulted in the introduction of evidence discovered in violation of appellant's Fifth Amendment right to due process of law and Sixth Amendment right to counsel. Appellant's claim of governmental misconduct is in two parts: first, the government substantially interfered with the Villars as defense witnesses; and second, the investigation of appellant's murder plot by taping his post-indictment statements was unconstitutional and led to witnesses whose testimony should have been suppressed. He submits that these acts demonstrate a pattern of misconduct which warrants reversal of his conviction.

This case began with the arrest of the Villars and the government's alleged misconduct had its origin there as well. Shortly after their arrest, the Villars furnished written statements to the agents admitting their involvement in drug trafficking with appellant. They agreed to cooperate with the government, although their cooperation was obtained after holding them incommunicado for nearly ten hours.

After the arrest of Terzado, the Villars were released on bond on April 1, 1988, and returned to Miami. The government furnished them with expense money to move their residence. Shortly thereafter, Terzado's investigator located the Villars. On April 15th, he obtained one-page affidavits from each of them which appeared to contradict the written statements that they had previously given to law enforcement officers. Helen Villar's affidavit, for instance, stated that she had never transported cocaine for Terzado or anyone else on any prior occasion. It further stated that she had made false statements because she felt pressured by the agents, and that she had not been allowed to make a telephone call for ten hours following her arrest. Rafael Villar's affidavit stated, *inter alia*, that he felt pressured and indicated that he had requested a lawyer but the agents continued to ask him questions: "I told them I wanted a lawyer ... I continued to answer his questions. I was frightened ... I was pressured into making the statements ..."

After learning of the affidavit, Agent Frye contacted Helen Villar and explained that it would not be in her "best interest" to talk to the defense's investigator. The government later advised her that she was free to speak with the defense's investigator. Thereafter, the government wrote the Villars' attorneys a letter indicating that their failure to cooperate would jeopardize their plea agreement.

Upon obtaining the Villars' affidavits, the defense sought to have the indictment dismissed as based on false information. This attack failed because the government had sought and obtained a superseding indictment in which the Villars' affidavits were disclosed to the grand jury. In addition, the defense sought to have the recordings ruled inadmissible because the Villars' consent was coerced and therefore involuntary. The magistrate denied these motions, finding that the affidavits merely "suggested" coercion; and the defense never presented any evidence aside from the affidavits.

The voluntariness motion was renewed at trial and denied by the district court. When examined on the April 15th affidavit, Helen testified that her fear was due to the expected consequences of the seizure of cocaine; the agents had not pressured her. She testified that the written consent form in which she agreed to the recording of her conversations with Terzado was voluntarily signed. The Villars had been allowed to call an attorney during the ten hours mentioned in the affidavit. The agents had told them to wait before calling home in order to protect the ongoing undercover operation. Helen later testified at sentencing that she only signed the April 15th defense affidavit because she was afraid. Rafael was asked whether he requested an attorney as indicated in his affidavit and testified he only intended to ask if a lawyer could be appointed for him. He never sought to stop the questioning.

Based on the Villars' testimony at trial and at sentencing, we agree with the district court's conclusion that their consent was voluntary and that the contradictory affidavits were not credible. The trial testimony of the Villars is simply more believable than the one-page affidavits obtained under such unusual circumstances. The finding of voluntariness with respect to the recorded conversations does not, however, preclude the possibility that the government engaged in prosecutional misconduct in this case. Although the claim was not clearly raised below, Terzado now argues that the prosecution coerced the Villars into becoming government witnesses.

■ The Supreme Court has recognized that a criminal defendant has a constitutional right to "present his own witnesses to establish a defense." *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). Although this right is specifically found in the Sixth Amendment right to compulsory process, the Court held that the right was so fundamental to a fair trial that it was guaranteed by the Due Process Clause of the Fourteenth Amendment. *Id.* Cases have held that various types of governmental interference can deprive the defendant of this due process right. *See, e.g., Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (defense witness intimidated by remarks of trial judge); *United States v. Henricksen*, 564 F.2d 197 (5th Cir.1977) (defense witness intimidated by terms of plea bargain); *United States v. Hammond*, 598 F.2d 1008 (5th Cir.1979) (defense witness intimidated by remarks of Federal Bureau of Investigation agent). This Circuit has recently reaffirmed that "[s]ubstantial [government] interference with a defense witness' free and unhampered choice to testify violates due process rights of the defendant. If such a due process violation occurs, the court must reverse without regard to prejudice to the defendants." *Demps v. Wainwright*, 805 F.2d 1426 (11th Cir.1986) (citing *United States v. Goodwin*, 625 F.2d 693, 703 (5th Cir.1980)), *cert. denied*, 484 U.S. 873, 108 S.Ct. 209, 98 L.Ed.2d 160 (1987).

Terzado claims that the facts of the instant case are indistinguishable from those of *Henricksen*, 564 F.2d at 198, where the government confessed error. In that case, a co-defendant, whose testimony would have tended to exonerate the defendant, plea bargained with the government. As part of his plea, the co-defendant agreed not to testify in any manner regarding defendant. If he did testify, the government stated that the agreement would be void, and that he would be tried on all counts of the indictment. The co-defendant refused to testify. This court, citing "substantial government interference," reversed the conviction and remanded for a new trial.

In this case, unlike *Henricksen*, the plea agreement did not prohibit the witness from testifying for the defendant, nor condition its operation upon the witness' refusal to testify. In the plea agreement, Helen Villar agreed "to cooperate fully and testify truthfully against any and all persons as to whom she may have knowledge whenever called upon to do so, and she understands this agreement does not require her to implicate any particular individual or individuals nor to make a case; rather, it required her to be truthful and testify truthfully whenever called upon; and if she does not fulfill her obligations, the Government will be released from its obligations under this agreement." In return for her promise, the government agreed to delay sentencing until after the trial of Terzado. It is clear that the plea agreement did not render the Villars' testimony inherently unreliable nor deprive Terzado of a potential defense witness.

Although government intimidation of a witness can constitute a denial of due process, the government's actions in this case did not substantially interfere with the Villars' free choice to testify either for or against Terzado. To the extent that the agent's suggestion to Helen Villar that it would be in her "best interest" not to talk to the defense's investigator was improper, this comment was later cured or at least mitigated by the government's advice that she was free to do so. The record reveals no other impropriety due to the govern-

ment's contacts with the Villars. Thus, we find that the government's conduct with respect to the Villars in this case does not rise to the level of a constitutional violation.

As a second instance of prosecutorial misconduct, Terzado contends that the government deliberately violated his Sixth Amendment right to counsel when it surreptitiously recorded his telephone conversations with a government informant following his indictment and during the period of his pretrial detention. Before trial, Terzado moved to dismiss the indictment or suppress his conversations with the informant, Joey Jiminez, on the ground that the secretly recorded conversations violated *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). The lower court denied his motion but, in accordance with the Supreme Court's holding in *Moulton*, severed the drug related charges (Counts One–Three) from the murder-for-hire charges (Counts Four–Six).

In the seminal decision of *Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964), the Supreme Court held that a defendant is denied the basic protection of the Sixth Amendment, guaranteeing the defendant's right to assistance of counsel, when federal agents "deliberately elicit" incriminating statements from him after he has been indicted and in the absence of his attorney. The Sixth Amendment right to counsel is viewed by the Supreme Court as "indispensible to the fair administration of our adversarial system of criminal justice", *Moulton*, 474 U.S. at 168–69, 106 S.Ct. at 483, and exists to insure that the accused is not "left irretrievably to his own devices without legal help when the heavy artillery of prosecutorial power is brought to bear". *United States v. Nocella*, 849 F.2d 33 (1st Cir.1988) (citing *Moran v. Burbine*, 475 U.S. 412, 430, 106 S.Ct. 1135, 1145–46, 89 L.Ed.2d 410 (1986)). Recognizing that the right to counsel is shaped by the need for assistance of counsel, the Court has found that the protections of the Sixth Amendment apply not only at trial but at "earlier, 'critical' stages in the criminal justice process where the results might well settle the accused's fate and reduce the trial itself to a mere formality". *Moulton*, 474 U.S. at 170, 106 S.Ct. at 484 (citations omitted).

Once the right to counsel has attached, the government is under an "affirmative obligation" to respect and preserve the accused's choice to seek this assistance, and the law enforcement authorities must take no action that "circumvents, and thereby dilutes the protection afforded by the right to counsel." *Moulton*, 474 U.S. at 171, 106 S.Ct. at 484. The Sixth Amendment protections apply equally to a coercive interrogation of a suspect held in custody, *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *Spano v. New York*, 360 U.S. 315, 325–27, 79 S.Ct. 1202, 1208–09, 3 L.Ed.2d 1265 (1959) (concurring opinions), and to an "indirect and surreptitious interrogation" made possible through the use of informants. *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199 (excluding incriminating statements which a defendant, who was not in custody, made to a codefendant who was cooperating with government agents in their continuing investigation of defendant's suspected narcotics activity); *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) (excluding incriminating statement which defendant made to a jailhouse informant who had engaged defendant in conversations about his pending bank robbery charges). The Supreme Court made clear in *Henry* that the government violates a defendant's Sixth Amendment right "[b]y intentionally creating a situation likely to induce [an accused] to make incriminating statements without the assistance of counsel." 447 U.S. at 274, 100 S.Ct. at 2189. This rule applies even where the government expressly instructs its informant not to initiate any conversations with the accused and not to question him regarding the pending charges. *Moulton*, 474 U.S. at 173–74, 106 S.Ct. at 485–86. In such cases, the government's "knowing exploitation ... of an opportunity to confront the accused without counsel being present is as much a breach of [its] obligation not to circumvent the right to the assistance of counsel as is the

intentional creation of such an opportunity." *Moulton,* 474 U.S. at 176, 106 S.Ct. at 487.

■ Thus, regardless of who initiates the conversation, the Sixth Amendment is violated whenever a government informant actively engages a defendant in conversation that is likely to elicit incriminating statements about the defendant's upcoming trial. Although the Sixth Amendment is not violated whenever—"by luck or happenstance"—the government obtains incriminating statements from the accused after the right to counsel has attached, any participation by a government informant "beyond merely listening" becomes the "functional equivalent" of direct police interrogation. *Kuhlmann v. Wilson,* 477 U.S. 436, 459, 106 S.Ct. 2616, 2629–30, 91 L.Ed.2d 364 (1986). By concealing the fact that the informant is a government agent, the police deny an accused the right to rely on counsel as a "medium" between himself and the government, a right guaranteed by the Sixth Amendment. *Moulton,* 474 U.S. at 176, 106 S.Ct. at 487.

■ Applying these principles to the facts in this case, we agree with the magistrate that the government violated Terzado's Sixth Amendment right when it arranged to record conversations between Terzado and its undercover informant, Joey. As in *Moulton,* it was the agents who suggested to the informant that he record his telephone conversations with the defendant. Although the agents' stated purpose was to record conversations about a murder scheme, and although the agents told Joey not to engage Terzado in any discussions regarding the pending federal case, the agents must have known that the informant was likely to obtain incriminating statements from Terzado with respect to crimes for which he had already been indicted. And, as the tapes reveal, Joey did in fact discuss with Terzado matters which related to the pending drug charges. Because the government deliberately created a situation likely to induce Terzado to "make statements that he had a constitutional right not to make to their agent prior to consulting with counsel," *Moulton,* 474

U.S. at 177, 106 S.Ct. at 488, it is clear that Terzado's Sixth Amendment rights were violated even though the agents had other, legitimate reasons for listening to defendant's conversations with its informant.

In determining the proper remedy for a violation of defendant's Sixth Amendment right, we must consider "the constitutional implications of a surreptitious investigation that yielded evidence pertaining to two crimes. For one, the defendant had been indicted; for the other, he had not." *Moran v. Burbine,* 475 U.S. 412, 431, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986). Although this court has previously held that evidence obtained through a separate criminal investigation can be admitted at the trial of the original crime "so long as investigating officers show no bad faith and do not institute the investigation of the separate offense as a pretext for avoiding the dictates of *Massiah,*" *United States v. Darwin,* 757 F.2d 1193, 1199 (11th Cir. 1985), the *Moulton* court expressly rejected a similar standard as a basis for allowing the evidence to be admitted at trial. In *Moulton,* the state argued that incriminating statements obtained by law enforcement officers should not be suppressed if they are obtained incident to a legitimate investigation of other crimes for which a defendant has not been indicted. Over a strong dissent, the Supreme Court squarely rejected this argument:

> In seeking evidence pertaining to pending charges, ... the Government's investigative powers are limited by the Sixth Amendment right of the accused. To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance, invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in Massiah.

*Moulton,* 474 U.S. at 180, 106 S.Ct. at 489. In so ruling, the Court did not question or minimize the government's legitimate and often compelling interest in continuing its investigation of the suspected criminal ac-

tivities of a defendant who has already been indicted or formally charged with a crime. "The police have an interest in the thorough investigation of crimes for which formal charges have already been filed. They have an interest in investigating new or additional crimes. Investigations of either type of crime may require surveillance of individuals already under indictment." *Id.* at 179, 106 S.Ct. at 489.

■ While incriminating statements pertaining to pending charges obtained in violation of the Sixth Amendment may not be introduced at the trial of those charges, the Supreme Court emphasized that "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." *Id.* at 180, n. 16, 106 S.Ct. at 489, n. 16. The Court reasoned that "to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at the time, would unnecessarily frustrate the public's interest in the investigation of criminal activities." *Id.* at 180, 106 S.Ct. at 489. Thus, under the teachings of *Maine v. Moulton*, it is clear that Terzado's recorded conversations obtained in the unlawful interrogation must be excluded from his trial of the drug-related charges, as the lower court recognized. Likewise, there is little doubt that Terzado's incriminating statements pertaining to the murder-for-hire scheme, as to which the Sixth Amendment right to counsel had not yet attached, would be admissible in a subsequent trial limited to those charges.

Under these Supreme Court precedents, the lower court determined that the proper remedy for the violation of Terzado's Sixth Amendment rights is not the dismissal of the indictment but the exclusion of the evidence at the trial of the drug related charges for which the defendant had been indicted at the time the recordings were made. In response to the defendant's argument that the evidence must be excluded from *any* trial because it was "illegally obtained" and its suppression is necessary to "preserve judicial integrity" and deter

further misconduct by the government, the magistrate stated:

> The simple answer to this argument is that the agents did nothing improper in taping Terzado's conversations with the government informant. Once the government learned of a possible murder scheme, it had a duty and responsibility to investigate its suspicions, even though Terzado was already under indictment for drug offenses.... A number of witnesses had advised the investigators that Terzado had previously sought the murders of Nadal and Gonzalez, and the agents had reason to suspect that Terzado was continuing or renewing his efforts to have one or both of these individuals killed. Although the agents were pursuing an investigation into all aspects of Terzado's suspected criminal activities, their purpose and objective in recording Terzado's conversations with Joey was to obtain information about a possible murder-for-hire scheme. The record is barren of any evidence suggesting that the agents acted in bad faith or constructed a "murder" theory only as a pretext for obtaining incriminating statements regarding the pending charges. *United States v. Nocella*, 849 F.2d 33 (1st Cir.1988). Had the agents engaged in such a subterfuge, the Court would not hesitate to preclude any use of the tape recordings as a sanction for such improper conduct. But, on the basis of the present record, [the court] find[s] that the agents had a reasonable belief or suspicion that Terzado was attempting to contract for the commission of a murder and that, under such circumstances, the agents would have been remiss had they not conducted a diligent investigation of this suspected criminal activity.

■ As the Supreme Court has recognized, when a defendant's right to counsel has attached for one crime, he is not insulated against interrogation as to other crimes, notwithstanding the absence of counsel. *Moran v. Burbine*, 475 U.S. at 431, 106 S.Ct. at 1146. To hold that the government is prohibited from investigating the defendant's involvement in new

crimes, simply because his right to counsel has attached for a separate offense, would be essentially to immunize a defendant from further prosecution. Indeed, in the context of this case, such a holding would be tantamount to declaring "open season" on government witnesses. The Sixth Amendment has not been interpreted to provide a cloak of immunity for a defendant during the pendency of an indictment, *see Hoffa v. United States*, 385 U.S. 293, 307–08, 87 S.Ct. 408, 416, 17 L.Ed.2d 374 (1966), *reh'g denied*, 386 U.S. 940, 87 S.Ct. 970, 17 L.Ed.2d 880 (1966), nor to provide a right to consult counsel for advice on committing crimes. This is especially true where the offense under investigation is a new or ongoing one, such as illegal efforts to thwart the forthcoming prosecution. *See* 1 W. LaFave & J. Israel, Criminal Procedure Sec. 6.4, p. 470 (1984). Based on a careful review of the record, we fully concur with the lower court's finding that the government acted properly in recording Terzado's conversations in an effort to investigate a possible plan to murder potential witnesses in this case.

 Terzado now argues that the court's attempt to remedy the *Moulton* violation by severing the murder-for-hire counts from the drug-related counts was inadequate. In support of his argument, Terzado submits that the government presented testimony at trial from two witnesses, Brunilda Gonzalez and Danny Gonzalez, whose identity and cooperation were obtained "solely" as a result of information learned from the government's illegally conducted investigation. The trial court's refusal to exclude the testimony of these two witnesses, appellant asserts, gave the government the benefit of its unlawful conduct. Appellant contends that their testimony should have been suppressed under the exclusionary rule as "fruit of the poisonous tree."

The government responds by arguing that *Moulton* applies only to a defendant's own statements and not to the testimony of any witnesses whose identity may have been procured as a result of the investigation. Moreover, the government submits that the two witnesses were already known to the authorities and that the *Moulton* violation did not cause these witnesses to testify. Finally, the government contends that the defense failed to preserve its objections at trial to the testimony of Danny Gonzalez and Brunilda Gonzalez.

We must first address the preservation issue. A careful review of the record reveals that the defense did in fact object to the testimony of Danny Gonzalez, albeit after its introduction, on the ground that the "evidence [was] derived from the government's unconstitutional conduct regarding *Maine v. Moulton*, a Sixth Amendment issue that was raised [earlier]." Therefore, the standard of review as to the admission of Danny Gonzalez' testimony is abuse of discretion. Defense counsel failed, however, to include Brunilda Gonzalez in his objection. Consequently, we must judge the court's admission of her testimony against the plain error standard under Fed.R.Crim.P. 52(b).

 The exclusionary rule, which bars the admission of evidence obtained in violation of the Constitution, extends beyond the direct products of police misconduct to evidence derived from the illegal conduct, or "fruit of the poisonous tree." *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). The government argues that the *Moulton* decision is limited to the exclusion only of defendant's own statements obtained in violation of his Sixth Amendment right. *See id.*, 474 U.S. at 179, 106 S.Ct. at 488–89. To be sure, the *Moulton* decision neither involved nor discussed other forms of evidence. The clear implication of the *Moulton* decision, however, is that courts should apply the exclusionery doctrine under these circumstances. *See, e.g.*, 474 U.S. at 190–92, 106 S.Ct. at 494–95 (Burger, J., dissenting) (arguing that application of the exclusionary rule by the majority made little sense as demonstrated by weighing the costs and benefits of excluding relevant and trustworthy evidence). Assuming the primary illegality can be established, we are persuaded by the host of other Supreme Court decisions which held that "the

exclusionary rule applies not only to the illegally obtained evidence itself, but also to other incriminating evidence derived from the primary evidence." *Nix v. Williams*, 467 U.S. 431, 441, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984) (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920)). Thus, verbal evidence, including live-witness testimony, which is derived from an unlawful invasion may be "no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." *Wong Sun v. United States*, 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963). Although the cases which mark the origin and development of the "fruit of the poisonous tree" doctrine involved violations of the Fourth Amendment guarantee against searches and seizures, *see, e.g., Silverthorne*, 251 U.S. 385, 40 S.Ct. 182; *Wong Sun*, 371 U.S. 471, 83 S.Ct. 407, the doctrine also applies to the fruits of evidence obtained in violation of an accused's Sixth Amendment right to counsel, *see, e.g., United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); as well as violations of the Fifth Amendment. *See, e.g., Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

The Supreme Court has emphasized, however, that the exclusionary rule "has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons." *Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 3048–49, 49 L.Ed.2d 1067 (1976). In situations where the exclusionary rule is applicable, the Court has "declined to adopt a 'per se or ''but for'' rule' that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest [or interrogation]." *United States v. Ceccolini*, 435 U.S. 268, 276, 98 S.Ct. 1054, 1060, 55 L.Ed.2d 268 (1978). The exclusionary doctrine bars evidence that has been illegally obtained only if the "fruit" is sufficiently connected to the "poisonous tree":

> We need not hold that all evidence is "fruit of the poisonous tree" simply be-

cause it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*Wong Sun*, 371 U.S. at 487–88, 83 S.Ct. at 417 (quoting R. Maguire, Evidence of Guilt 221 (1959)).

Whether evidence is sufficiently distinguishable turns on the application of three closely related but analytically distinct exceptions to the exclusionary rule. First, the challenged evidence will be admissible under the "inevitable discovery" doctrine if it inevitably or ultimately would have been discovered by lawful means without reference to the police misconduct. *Nix*, 467 U.S. at 444, 104 S.Ct. at 2509. Second, under the "independent source" doctrine, the challenged evidence will be admissible if it derived from a lawful source independent of the illegal conduct. *Silverthorne*, 251 U.S. at 392, 40 S.Ct. at 183. Third, the challenged evidence will be admissible under the "attenuation" doctrine if the causal connection between the constitutional violation and the discovery of the evidence has become so attenuated as to dissipate the taint. *Ceccolini*, 435 U.S. at 273, 98 S.Ct. at 1058. We hold that the testimony of Brunilda Gonzalez and Danny Gonzalez was properly admitted under the inevitable discovery exception and the independent source exception to the exclusionary rule, respectively.

Although the inevitable discovery exception has been recognized in varying forms by federal courts for many years, *see, e.g., Wayne v. United States*, 318 F.2d 205 (D.C.Cir.), *cert. denied*, 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963), the Supreme Court for the first time invoked it as a basis for the admission of evidence only recently in *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). In considering whether certain evidence was admissible as fruit of an illegal interroga-

tion, the Supreme Court relied on the basic principles underlying the exclusionary rule and its exceptions. According to the Court, the "core rationale" of the rule is to deter police misconduct by ensuring that the prosecution is not put in a better position than it would have been in if no illegality had transpired. The high social cost of allowing obviously guilty persons to go unpunished, however, requires at the same time that the prosecution generally not be put in a *worse* position by the operation of the rule than it would have been but for the constitutional violation. In these situations, the "public interest in having juries receive all probative evidence of a crime" outweighs the need to discourage police misconduct. Under this rationale, the Court justified the recognition of the independent source doctrine as well as the inevitable discovery exception. The Court held that, just as evidence that had been discovered by means wholly independent of any constitutional violation was admissible, when the information ultimately or inevitably would have been discovered by entirely lawful means, the exclusionary rule should not apply. In either case, the Court reasoned that there would be no additional deterrence value in suppressing the evidence. The exclusion of evidence would fail to restore the parties to their previous positions and thus upset the careful weighing of competing interests underlying the exclusionary rule. *Id.; see United States v. Cherry*, 759 F.2d 1196 (5th Cir.1985), *cert. denied*, 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987).

With respect to the burden of proof, the Court held that, in order for otherwise tainted evidence to be admissible, the prosecution had to demonstrate the applicability of the inevitable discovery exception by a preponderance of the evidence. In establishing this standard, the Court specifically rejected any requirement that the prosecution prove the absence of bad faith. Accordingly, as long as it can be shown by "demonstrated historical facts", 467 U.S. at 445 n. 5, 104 S.Ct. at 2509 n. 5, that an independent and untainted discovery would inevitably have occurred, the evidence will be admissible.

Prior to the *Nix* decision, the elements of the inevitable discovery rule in this circuit were first set forth in a former Fifth Circuit case, *United States v. Brookins*, 614 F.2d 1037 (5th Cir.1980). To qualify for admissibility, there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued prior to the occurrence of the illegal conduct. *Id.* at 1042 n. 2. Recognizing that the *Nix* decision was silent as to what constitutes an "inevitable" discovery under the doctrine, this Court followed the *Brookins* decision in adopting the same rule. *United States v. Satterfield*, 743 F.2d 827 (11th Cir.1984), *cert. denied*, 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985). *See also United States v. Roper*, 681 F.2d 1354, 1358 (11th Cir.1982), *cert. denied*, 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983).

In *Brookins*, the police obtained the identity of a key prosecution witness through an illegal interrogation of the defendant. The Court found "more than a reasonable probability existed that normal police investigation, if the interrogation had never occurred, would have disclosed the identity of [the witness]." The Court held the witness' testimony admissible because lawful police inquiries that were already "set in motion" probably would have disclosed the witness' identity. 614 F.2d at 1048.

In this case, both the identities of Brunilda Gonzalez and Danny Gonzalez, and their relationships with Terzado, were well known to those authorities investigating the case. The government maintains that these witnesses were first identified by means of interviewing Helen Villar shortly after her arrest on April 1, 1988. Although it is unclear from the record whether Helen Villar did in fact identify Brunilda and Danny at that time, there is little doubt that Helen Villar was capable of relating to the police their identities *prior* to the unlawful interrogation in early May.

Helen Villar testified that, during November 1987, she accompanied Terzado, David Nadal, Danny Gonzalez and Brunilda Gonzalez to the Chicago area for an alleged cocaine delivery. Ms. Villar stated that she also traveled to Las Vegas, Nevada with Brunilda Gonzalez and Terzado in 1987. Helen Villar further testified that she had first met Brunilda Gonzalez sometime earlier in Miami, Florida, while staying with Terzado. At that time, Ms. Gonzalez told Ms. Villar that she was the mother of Terzado's children. It is undisputed that Ms. Gonzalez had an intimate relationship with Terzado, and that the relationship was publicly known. Indeed, the defense later sought to exclude Brunilda Gonzalez' testimony under the marital privilege.

Even assuming that the identity of Brunilda Gonzalez was unknown to the investigating authorities at the time of the taping, appellant's contention that this witness would not have been discovered but for the unlawful interrogation must fail. As noted above, Helen Villar was quite capable of identifying Brunilda Gonzalez as a co-conspirator of Terzado and, at the time of the taping, had voluntarily agreed to cooperate fully with authorities in their investigation. On the basis of the present record, we have no doubt that the identity of Brunilda Gonzalez would have been discovered by normal police investigation despite the police misconduct and that the leads making the discovery inevitable were possessed by and being actively pursued by the police prior to the illegal interrogation. Thus, we hold that the district court's refusal to exclude, *sua sponte*, the testimony of Brunilda Gonzalez was not plainly erroneous.

■■■■ Under the "independent source" doctrine, the challenged evidence will be admissible if the prosecution can show that it derived from a lawful source independent of the illegal conduct. *Silverthorne*, 251 U.S. at 392, 40 S.Ct. at 183. In such a case, there is no reason to exclude the challenged evidence since the police misconduct is not even a "but for" cause of its discovery. The critical inquiry under the independent source doctrine is whether the challenged evidence was obtained from lawful sources and by lawful means independent of the police misconduct. *See Segura v. United States*, 468 U.S. 796, 805, 104 S.Ct. 3380, 3386, 82 L.Ed.2d 599 (1984).

■■■■ Appellant's contention that the identity of Danny Gonzalez was first discovered through the illicit recordings is without merit. As a former associate who became the focus of Terzado's murder plans, Danny Gonzalez was well-known to law enforcement authorities. Prior to the taping, the government learned from Victor Gonzalez that, in late November or early December 1987, Terzado had offered him $10,000 to shoot into a street corner frequented by David Nadal and Danny Gonzalez. After his arrest on May 5, 1988, but prior to the taping, Joey Jiminez also indicated that Terzado had repeatedly asked his assistance in killing Danny Gonzalez or David Nadal. It was this information in part which prompted the authorities to surreptitiously record Terzado's conversations with Joey.

We find that the identity of Danny Gonzalez was derived from a lawful source independent of the police misconduct. Since Danny's identity was already known to authorities prior to the taping, the district court's admission of his trial testimony was not an abuse of discretion. It is one thing to exclude evidence obtained in an unlawful manner; it is quite another to exclude the testimony of a witness whose identity was lawfully discovered. *See Segura*, 468 U.S. at 814, 104 S.Ct. at 3390; *United States v. Crews*, 445 U.S. 463, 471–72, 475, 100 S.Ct. 1244, 1249–50, 1252, 63 L.Ed.2d 537 (1980) ("The exclusionary rule enjoins the Government from benefiting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality.")

■■■■ As to Terzado's argument that the cooperation of these witnesses was obtained "solely" as a result of evidence derived from the government's "blatantly unconstitutional" investigation, we believe that appellant overstates the Sixth Amendment violation in this case. We held that a *Moulton* violation occurred only to the ex-

tent that the government deliberately created a situation likely to induce Terzado to make statements, without the presence of counsel, concerning the pending trial of drug related charges. We did not hold that a *Moulton* violation occurred when the government "deliberately elicited" comments from defendant concerning the murder-for-hire scheme for which the Sixth Amendment right to counsel had not yet attached.

Contrary to appellant's assertions, the government's violation of Terzado's right to counsel recognized in *Moulton* did not "cause" these witnesses to testify. The government had an obligation to investigate the murder scheme which it reasonably believed to exist, even though Terzado was already under indictment for drug offenses. As a result of the government's lawful investigation, Brunilda Gonzalez was arrested and charged in the superseding indictment. In exchange for her plea of guilty to Count Six, the murder-for-hire count, she agreed to testify at Terzado's trial. Thus, Brunilda Gonzalez' testimony was not the product of Terzado's unlawful interrogation regarding the drug charge, but rather was the direct result of the government's lawful investigation into her participation in the murder-for-hire scheme. More precisely, Brunilda Gonzalez' testimony was the product of her voluntary decision to promote her own interest with respect to sentencing for the murder-for-hire conviction. *See United States v. Schaefer,* 691 F.2d 639 (3rd Cir.1982) (witness' decision to testify was not the product of the unlawful seizure, but stemmed from his voluntary decision to promote his own interest regarding sentencing).

■ Furthermore, the testimony of Danny Gonzalez was also not the result of the government's violation of Terzado's right to counsel concerning the pending drug charges. We previously held that, as a former associate of Terzado and as a target of his assassination plans, Danny Gonzalez' identity was already known to the investigating authorities prior to the unlawful taping. A finding that his identity was lawfully obtained precludes any causal connection between the testimony of Danny Gonzalez and the illegal conduct.

Appellant contends that our analysis should focus exclusively on the "attenuation" doctrine developed by the Supreme Court in *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). The *Ceccolini* Court applied the doctrine, in the context of a Fourth Amendment violation, to admit testimony of a witness despite the causal connection between the illegal search and the testimony. In ruling that the witness' testimony was sufficiently attenuated to be admissible, the Court set forth an analytical framework to evaluate the admissibility of live witness testimony under the attenuation exception of the exclusionary rule.

■ The *Ceccolini* attenuation analysis does not apply, however, absent an initial finding of at least *some* causal connection between the illegality and the testimony. As the Supreme Court recognized, "the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify." *Id.,* 435 U.S. at 277, 98 S.Ct. at 1060. The Court made clear that the attenuation necessary to dissipate the taint is more readily found when the alleged "fruits" consist of the testimony of witnesses, as distinguished from tangible physical evidence. The Court noted that the exclusion of testimony would perpetually disable a willing witness from testifying about material facts, "regardless of how unrelated such testimony might be to the purpose of the originally illegal [conduct] or the evidence discovered thereby." Because the costs of excluding live-witness testimony often will be greater that its deterrent value, the Court in *Ceccolini* required a "closer, more direct link" between the illegality and relevant testimony of a third-party witness. 435 U.S. at 278, 98 S.Ct. at 1061. Thus, attenuation analysis is inappropriate in a case, such as here, in which there has not been shown at least some causal connection between the illegal interrogation and the witness' willingness to testify.

Perhaps this case can best be viewed as one of competing values between, on the one hand, the social utility in giving law enforcement officers relatively wide latitude to investigate alleged violations of the law, and, on the other hand, the individual's interest in a broadly construed Sixth Amendment right to counsel. By allowing the limited use of evidence derived from a surreptitious investigation relating to two crimes—for one, the right to counsel has attached; for the other, it has not—we can achieve the delicate balance of these competing values. The application of the exclusionary rule, subject to its limited exceptions, to evidence derived from this investigation at the trial of the original charge will adequately safeguard the defendant's Sixth Amendment right to counsel. At the same time, the unfettered admission of the evidence at the trial of the subsequent offense, subject only to the traditional evidentiary standards, will further the government's legitimate interest in the investigation and prosecution of criminal activities. "Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1981). We hold that the lower court's severance of the drug related charges from the murder-for-hire charges sufficiently remedied the violation of appellant's right to counsel in this case.

Finally, it follows from the foregoing analysis that the conduct exhibited by the government was not "so outrageous as to shock the universal sense of justice". *See United States v. Arango*, 853 F.2d 818 (11th Cir.1988). Indeed, we should encourage the kind of diligent efforts of the police shown by this record without rewarding any police misconduct. In this case, there is no suggestion that the police should have—or could have—conducted their investigation in any other way. Accordingly, the government's actions do not warrant the dismissal of the indictment.

### B. *Admission of Evidence*

As his second ground for reversal, appellant alleges the improper admission of highly inflammatory evidence which prevented a fair jury determination of the issues. Under the "guise" of overt acts, Terzado claims that the government introduced, and the court admitted, a number of incidents whose prejudicial effect far outweigh their probative value under Fed.R. Evid. 403. Specifically, appellant objects to the admission of the following evidence: (a) evidence concerning the attempted murder of David Nadal; (b) evidence regarding the possession of weapons; (c) evidence of unexplained wealth; and (d) testimony referring to a cutting agent in the cocaine as "rat poison."

The district court possesses broad discretion to admit evidence if it has any tendency to prove or disprove a fact in issue. *United States v. Finestone*, 816 F.2d 583, 585 (11th Cir.), *cert. denied*, 484 U.S. 948, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987). Conversely, the court's discretion to exclude evidence under Rule 403 is limited. Evidence may be excluded only when "its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. As this court has cautioned, "Rule 403 is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence." *Finestone*, 816 F.2d at 585 (quoting *United States v. Betancourt*, 734 F.2d 750, 757 (11th Cir.), *cert. denied*, 469 U.S. 1076, 105 S.Ct. 574, 83 L.Ed.2d 514 (1984)). The balance under the Rule, therefore, should be struck in favor of admissibility. *Id.; accord, United States v. Norton*, 867 F.2d 1354 (11th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 3192, 105 L.Ed.2d 701 (1989). In sum, the district court is vested with considerable discretion to admit such probative evidence, and its decision will not be disturbed on appeal absent a clear showing of abuse of that discretion. *United States v. Roper*, 874 F.2d 782 (11th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989).

 Turning first to the evidence of the attempted murder of David Nadal, the government introduced the testimony of Victor Gonzalez. As a close associate of Terzado, Victor was familiar with a theft of approximately twelve kilograms of cocaine from appellant's warehouse. He explained that Terzado initially told him David Nadal had committed the cocaine theft. Terzado later discovered, however, that Danny Gonzalez was the actual perpetrator because the cocaine had been located in an abandoned house belonging to Danny's mother. Danny Gonzalez confirmed during his testimony that he stole the twelve kilos of cocaine because he was "upset" with Terzado over the insufficient amount of compensation received for a prior cocaine delivery. Victor further testified that Terzado offered him $10,000 to throw a grenade into a crowded street corner frequented by David Nadal and Danny Gonzalez.

Victor testified concerning Terzado's possible involvement in the Nadal shooting in December of 1987. Immediately after the Nadal shooting, appellant called Victor from Las Vegas—an "unusual" action— and asked how David was doing. Terzado later stated to him that if Nadal had been intended to die, he would have died as a result of the shooting. Victor further testified that, approximately two weeks after the shooting, he was present when Terzado made a large cash payoff to an unknown individual at a car wash.

Brunilda Gonzalez likewise testified concerning the attempted murder of David Nadal. Brunilda testified that she, Helen Villar, and Terzado were in Las Vegas when they first learned from Victor Gonzalez that David Nadal had been shot. She explained that, just prior to the Las Vegas trip, Terzado talked about an individual named Glen Perriman, also known as "GAP," and gave her directions to deliver a suitcase containing a gun to GAP. After the Nadal shooting, Brunilda Gonzalez inquired into appellant's connection with GAP and the Nadal shooting. His response to her inquiry was simply "you better shut up." Approximately two weeks later, according to Brunilda Gonzalez, Ter-

zado paid approximately $18,000 to the individual known as GAP.

Detective Eddie Martinez, a Miami homicide investigator, testified that he questioned Terzado about the Nadal shooting when he voluntarily appeared at the Miami Police Department. Terzado claimed to be concerned about the safety of his family. After Martinez advised Terzado of his *Miranda* rights, appellant agreed to talk without the presence of his attorney. During the questioning, Terzado denied any involvement in the shooting but admitted that he knew GAP and David Nadal. Terzado further stated that he was a criminal and a silent killer; that he made no threats; that he was worth two or three million dollars; and that he was not sorry that Nadal was shot. Martinez also testified that David Nadal initially identified GAP as the perpetrator of the shooting, but later recanted his sworn statement and the charges against GAP were eventually dropped.

The threshold issue is the relevancy of the evidence concerning the conspiracy count. The indictment in this case charged Terzado, among others, with conspiracy to distribute cocaine. As an overt act in furtherance of the conspiracy, the indictment cited the attempted murder of co-conspirators David Nadal and Danny Gonzalez, "whom TERZADO believed had stolen 12 kilograms of cocaine from him." We find that the substantial evidence of Terzado's plot to kill his former associate, David Nadal, alleged as an overt act in furtherance of a conspiracy, is relevant to establish the existence of the conspiracy; to explain the relationship of the conspirators to each other and the conspiracy; and to demonstrate the methods by which the conspiracy operated. Victor Gonzalez described the theft of twelve kilos of cocaine which formed the motive of the attempted murder, and his knowledge of the theft and the murder plot tended to prove the existence of the conspiracy and the identity of its membership. Brunilda Gonzalez' testimony linked the alleged triggerman, the weapon, and the payoff directly to Terzado, the alleged leader of the conspiracy. Victor Gonzalez' testimony that Terzado had previously sought

to have David Nadal and Danny Gonzalez murdered, and Eddie Martinez' testimony that Terzado claimed to be a "silent killer" who was not sorry that Nadal was shot, tends to show the pattern of violence allegedly used by appellant to maintain control over the cocaine operation.

The facts of this case are not unlike those of *United States v. Dekle*, 768 F.2d 1257 (11th Cir.1985). In that case, the defendants were charged with possession of marijuana with intent to distribute and conspiracy to commit that offense. At trial the government presented evidence of assault on a third person who allegedly conspired to steal marijuana from the defendants. The court held that the trial court properly admitted the evidence as proof of an overt act in furtherance of the conspiracy.

We must recognize that "[a]ll evidence which tends to establish the guilt of a defendant is, in one sense, prejudicial to that defendant." *United States v. Bailleaux*, 685 F.2d 1105, 1111 (9th Cir.1982). Simply because the evidence is damaging or prejudicial to a defendant's case does not mean, however, that the evidence should be excluded. "[I]t is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403." *United States v. McRae*, 593 F.2d 700, 707 (5th Cir.), *cert. denied* 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979) (emphasis in original). We conclude that the admittedly prejudicial effect of evidence concerning the attempted murder of an alleged co-conspirator neither substantially outweighs its highly probative value nor is inherently unfair. *Cf. United States v. Meester*, 762 F.2d 867 (11th Cir.), *cert. denied*, 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985) (evidence that certain conspirators killed a pilot who refused to return airplane until he was paid was relevant to the charge of drug conspiracy, and probative value of such evidence outweighed its prejudicial effect and therefore admission of such evidence was not an abuse of discretion.); *United States v. Finestone*, 816 F.2d 583 (11th Cir.) (evidence of kidnapping and murder of individual who allegedly absconded with money belonging to racketeering enterprise was admissible to prove pattern of racketeering activity and overt acts, as well as to show membership and participation in the RICO conspiracy, notwithstanding defendant's objection that he was not involved in murder, and that he was unduly prejudiced thereby), *cert. denied*, 485 U.S. 972, 108 S.Ct. 1252, 99 L.Ed.2d 449 (1988). Although we do not doubt this is a relatively close case, the balance in close cases is struck in favor of admissibility in determining whether its probative value is outweighed by the danger of unfair prejudice. Accordingly, we cannot conclude that the trial court abused its discretion in refusing to exclude this evidence.

Terzado also complains about the admission of evidence concerning his possession of weapons. In this case, no weapons were actually introduced into evidence but certain witnesses testified concerning appellant's possession of various firearms. Appellant made no objection, however, to Victor Gonzalez' testimony about the weapons which Terzado possessed, nor did he object to Brunilda Gonzalez' testimony as to Terzado's purchase of shotguns. Indeed, he did not object when Danny Gonzalez testified about concealing weapons for Terzado in the attic of his mother's house. When the government sought to offer a photograph of the guns found in the attic, the defense objected due to surprise and the court sustained the objection. When the defense "opened the door" by cross-examining Danny Gonzalez about the firearms, however, the government re-offered the photograph which was received over defense's objection. *Cf. United States v. Lester*, 749 F.2d 1288 (9th Cir.1984) (admitting testimony as to defendant's possession of weapons in obstruction of justice case which was not predicated on violence was not so prejudicial as to be an abuse of discretion in light of fact that government referred to possession of weapons only after defense had brought up various shootings in cross-examining government witnesses).

It is uniformly recognized that weapons are often as much "tools of the trade" as the most commonly recognized narcotics paraphernalia. *United States v. Adams,* 759 F.2d 1099, 1108 (3rd Cir.), *cert. denied,* 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985). *Accord United States v. Sarda–Villa,* 760 F.2d 1232, 1234 n. 1 (11th Cir. 1985). Since weapons can be viewed as tools of illegal narcotics trafficking, the testimony of Terzado's former associates as to his possession of various weapons is probative evidence of appellant's involvement in a cocaine conspiracy. More specifically, the testimony had at least circumstantial relevance to Terzado's knowledge and intent to participate in the conspiracy, and to the type of protection appellant believed necessary to protect its operation. *See, e.g., United States v. Rodriguez,* 765 F.2d 1546 (11th Cir.1985) (admitting into evidence firearms even without a showing of a direct connection to the charges, since such weapons are many times "tools of the trade" for drug dealers, and since the evidence thus had circumstantial relevance to defendant's intent on drug conspiracy count); *see also United States v. Martinez,* 808 F.2d 1050 (5th Cir.), *cert. denied,* 481 U.S. 1032, 107 S.Ct. 1962, 95 L.Ed.2d 533 (1987) (handgun properly admitted in prosecution for drug conspiracy since weapon was tool of trade of those engaged in illegal drug activity and was highly probative in proving criminal intent, and inference of illegal enterprise arising from its presence supported conspiracy theory). We find that the probative value of the testimony outweighed any likely prejudicial impact. Thus, the district court's admission of the testimony concerning appellant's possession of weapons was not plainly erroneous under Fed.R.Crim.P. 52(b) and the court's refusal to exclude the photograph of the firearms was not an abuse of discretion.

■■■ Appellant further alleges the prosecution prejudiced the jury by eliciting irrelevant comments from witnesses concerning his apparent wealth. Officer Martinez testified that, while interviewing Terzado about his involvement in the Nadal shooting, he observed appellant wearing a large gold bracelet on his left wrist, a lot of thick gold chains around his neck, and several rings on his fingers. Martinez also stated that Terzado claimed to be worth two or three million dollars. After Helen Villar testified as to Terzado's "Excaliber" automobile, the government introduced a photograph which showed appellant sitting in the luxury antique car.

Although the presence of unexplained wealth can be relevant to drug cases, *see, e.g., United States v. Dazzo,* 672 F.2d 284, 289 (2nd Cir.), *cert. denied,* 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 77 (1982), the mere fact that a defendant wears gold jewelry, boasts of his financial worth and drives a luxurious automobile, without a showing that those possessions were not derived from legitimate sources, is at best marginally probative of his involvement in drug trafficking. A showing that Terzado lacked legitimate sources for his alleged opulent lifestyle would greatly increase the probative value of this evidence to the charges in the indictment. For instance, the government could have attempted to show that appellant's expenditures exceeded his reported earnings by introducing into evidence his tax returns for the years covered by the indictment and, thus, create a permissible inference that such wealth was derived from illicit activities. In this case, the government's failure to discount the possibility that the jewelry and the automobile were legitimately earned from appellant's pawn shop and video store substantially reduces its probative value. Nevertheless, we recognize that while the relevance of this evidence was low, the prejudicial effect of such evidence was similarly low. *See United States v. Cruz,* 797 F.2d 90 (2nd Cir.1986). In view of the length of the trial, any prejudicial effect from a few references to appellant's possession of these luxury items is merely speculative. Consequently, we cannot conclude that appellant was substantially prejudiced thereby.

■■■ Appellant further contends he was prejudiced by testimony that his cocaine was "cut" (diluted) with "rat poison." The government's chemist testified that one of

the five kilos seized from the vehicle operated by the Villars on March 31, 1988, was cut with boric acid. The chemist noted that boric acid is commonly used as an antiseptic or an insecticide. Danny Gonzalez testified that boric acid and acetone were often used by Terzado to cut his cocaine. Brunilda Gonzalez' testimony was more graphic, referring to the boric acid as "rat poison."

The testimony concerning the composition of cutting agents in the cocaine is clearly relevant to the charges against Terzado. Since the testimony shows that appellant had cut his cocaine with boric acid on previous occasions, the chemist's testimony tended to prove that the five kilos seized from the Villars belonged to Terzado. Although any reference to the cutting agent as "rat poison" is concededly prejudicial, we cannot conclude that its prejudicial effect substantially outweighs the probative value of the testimony concerning the cocaine composition. Accordingly, we find that this isolated comment does not warrant the exclusion of the testimony under Rule 403.

### C. Conspiracy Instruction

During the deliberations, the jury posed the following written question: "If the jury agrees on *one* of all of the overt acts per count, then that count shall either be guilty or not guilty. Is that correct?" The trial court responded to this question in writing as follows:

> The only count that requires the proof of an overt act is Count Two, the conspiracy count. With respect to that count, the government must prove beyond a reasonable doubt at least one of the overt acts in furtherance on the conspiracy in order to authorize a conviction.

Although the defense took exception to the above-stated charge by claiming it would provide "too much emphasis," no demand was made that the court reinstruct the jury on the entire conspiracy charge.

The defense now argues that the court's answer "if taken without regard to the instructions as a whole," might tend to confuse a jury and authorize a conviction on the conspiracy count if the jury found any overt act was committed without finding that all of the elements of the conspiracy were proven beyond a reasonable doubt. Moreover, appellant maintains that the district court erroneously instructed the jury on the conspiracy count since there is no requirement that the government demonstrate the commission of any overt act under 21 U.S.C. Sec. 846. The government argues that the court did not need to give the entire conspiracy instructions again, and the court properly stated an answer to the jury's question.

Unlike most other types of conspiracies, conviction of a drug conspiracy under Section 846 does not require proof of any overt act. *United States v. Lee*, 622 F.2d 787 (5th Cir.1980), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 303 (1981); *compare* 18 U.S.C. Sec. 371 (requiring an "act to effect the object of the conspiracy"). In order to convict a defendant of a Section 846 conspiracy, the government must prove only the existence of a conspiracy, that the defendant knew of it, and that, with knowledge, the defendant voluntarily became a part of the conspiracy. *United States v. Arango*, 853 F.2d 818 (11th Cir.1988). The existence of a conspiracy may be established through direct or circumstantial evidence. *United States v. Montes–Cardenas*, 746 F.2d 771 (11th Cir.1984). A defendant's knowing participation in the conspiracy may be established through proof of surrounding circumstances, such as acts committed by the defendant which furthered the purpose of the conspiracy. *United States v. Bain*, 736 F.2d 1480, 1485 (11th Cir.), *cert. denied*, 469 U.S. 937, 105 S.Ct. 340, 83 L.Ed.2d 275 (1984).

The superseding indictment in this case alleged twenty overt acts committed by Terzado and his co-conspirators in furtherance of the conspiracy. Since the government elected to allege these overt acts in its indictment, the district court's position appears to be that the government would be required to prove at least one of the overt acts in order to establish a conviction under Section 846. Without objection, the court initially instructed the jury:

What the evidence in the case *must* show beyond a reasonable doubt is: *First:* That two or more persons in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the indictment; and *Second:* That the defendant knowingly and willfully became a member of such conspiracy, and that thereafter one or more of the conspirators knowingly committed one or more of the overt acts charged in furtherance of some object or purpose of the conspiracy.

■ An appellate court must review the entire jury charge and determine whether, taken as a whole, the issues and law presented to the jury were adequate. *United States v. Roper*, 874 F.2d 782 (11th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 189, 107 L.Ed.2d 144 (1989); *see also United States v. Park*, 421 U.S. 658, 674, 95 S.Ct. 1903, 1912, 44 L.Ed.2d 489 (1975) ("a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge"). Turning to the jury charge in this case, the district court initially instructed that the government must prove all elements of the offenses beyond a reasonable doubt. Immediately prior to instructing the jury as to the offense of conspiracy, the court restated that the evidence "*must* show beyond a reasonable doubt" the elements of a conspiracy. The court further emphasized that the jurors should follow all the instructions as a whole and cautioned them to "single out, or disregard" any of the court's instructions on the law.

■ We find that the district court's answer to the jury's question, combined with its original instruction regarding the conspiracy, adequately presented the issues and the law to the jury. The jurors could only convict on the basis of an overt act standing alone if they disregarded the original instructions. There is no indication the jury failed to follow the court's instructions as a whole or was misled by the court's response to its question without a restatement of the entire conspiracy instruction. Indeed, the court's answer was entirely consistent with the original jury charges. *See Roper*, 874 F.2d at 790 (concluding that the court properly answered the jury's question concerning conspiracy law without repeating the entire conspiracy charge). Although the court's instruction required the commission of an overt act in order to authorize a conviction under the conspiracy count, this instruction actually placed a greater burden on the government than it was required to prove and thus inured to the benefit of the defendant rather than his prejudice. *See United States v. Thomas*, 567 F.2d 638 (5th Cir.), *cert. denied,* 439 U.S. 822, 99 S.Ct. 90, 58 L.Ed.2d 114 (1978); *see also United States v. Swift*, 732 F.2d 878 (11th Cir.1984) ("any possible confusion that may have resulted from the erroneous answer to the jury's question operated to the defendant's benefit"), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 905, 83 L.Ed.2d 920 (1985). Such an error, which operates to the advantage of the defendant, does not serve as a basis for reversal. *Swift*, 732 F.2d at 881. In this case, there is more than sufficient evidence based upon which the jury could have found that an agreement existed between appellant and a co-conspirator to distribute cocaine, and that he knowingly participated in the conspiracy, notwithstanding the additional burden of proving an overt act. Accordingly, the district court committed no reversible error.

### D. *Sentence Enhancement*

Finally, appellant objects to the district court's enhancement of his sentence based on its finding that he should be held responsible under the sentencing guidelines for distributing at least sixty-five kilograms of cocaine. Specifically, he raises his objection on two separate grounds: (1) the court's improper reliance on cocaine quantities delivered prior to November 1, 1987, because Congress explicitly stated in the Sentencing Reform Act of 1987 that the guidelines were not to apply to offenses which occurred prior to the effective date of the guidelines; and (2) the court's failure to require the government to prove the commission of these acts beyond a reasonable doubt, but rather only by a preponder-

ance of the evidence. Additionally, appellant argues that a prior burglary conviction should not have been used to enhance his sentence because the court that accepted the plea did not independently satisfy itself that a factual basis existed for the plea.

Turning to his first objection, appellant complains that the district court improperly relied on cocaine deliveries which occurred prior to the effective date of the sentencing guidelines. The effective date of the Sentencing Reform Act of 1984, Pub.L. 98–473, 98 Stat. 1837, 1987 (1984) was set out in Sec. 235(a)(1), which provided for the Act to take effect on November 1, 1987. Pub.L. 98–473, Title II, Ch. II, Sec. 235(a)(1), October 12, 1984, 98 Stat. 2031, as amended by Section 4 of Pub.L. 99–217, December 26, 1985, 99 Stat. 1728. The express language of this portion of the Act originally placed no apparent qualification on the November 1, 1987, effective date. In order to clarify the ambiguous statutory framework, Congress amended the statute's effective date provision. On December 7, 1987, Section 235(a)(1) of the Sentencing Reform Act was expressly amended to provide that the provisions of the Act "shall apply only to offenses committed after the taking effect of [the Sentencing Reform Act of 1987]." Pub.L. 100–182, Sec. 2(a), 101 Stat. 1266. Thus, the guidelines apply only to those defendants whose offenses were committed on or after November 1, 1987. Likewise, offenses committed prior to the Act's effective date would be governed by the pre-guideline sentencing provisions.

 The question arises whether the guidelines apply to an offense such as a conspiracy that began prior to November 1, 1987, but continued past that date. In this case, Terzado was convicted of conspiracy to possess cocaine with intent to distribute it, in violation of 21 U.S.C. Secs. 841(a)(1) and 846. The conspiracy for which he was charged and convicted began "on or about the summer of 1987 and continuing thereafter, up to and including the date of this indictment [June 7, 1988]." Thus, the indictment alleges the offense began before the effective date of the sentencing guidelines. But conspiracy is a *continuing* offense. Since Terzado's conspiracy offense continued well after November 1, 1987, we conclude that the offense was committed after the effective date. *See United States v. White*, 869 F.2d 822 (5th Cir.) *cert. denied*, — U.S. —, 109 S.Ct. 3172, 104 L.Ed.2d 1033 (1989).

 Congress through the Sentencing Reform Act of 1984, delegated to the Sentencing Commission broad authority to establish sentencing policies and devise guidelines to be used for sentencing. *See generally* 18 U.S.C. Sec. 3551, et seq., 28 U.S.C. Secs. 991–998. The creation of the Sentencing Commission by the Act and promulgation by the Commission of guidelines did not violate constitutional principles of separation of powers. *United States v. Mistretta*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). Under the guidelines, Section 1B1.2, the sentencing court "shall apply the offense guideline ... most applicable to the offense of conviction.... [and] determine the applicable guideline range in accordance with Section 1B1.3 (Relevant Conduct)." *See generally*, United States Sentencing Commission, *Guidelines Manual*, Sections 1B1.2–1B1.3. Under the revised relevant conduct section, Section 1B1.3, effective January 15, 1988, relevant conduct includes "all acts ... by the defendant, or for which the defendant would otherwise be accountable, that occurred during the commission of the offense of conviction." In the application notes of this section, the court is specifically instructed to include conduct "in furtherance of the conspiracy that is known or was reasonably foreseeable by the defendant." In addition, the background notes to the same section state that even "[c]onduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." Most importantly, under the offense of conspiracy, Section 2D1.4, the application notes state: "If the defendant is convicted of a conspiracy that includes transactions in controlled substances in addition to those that are the subject of substantive counts of conviction, each conspiracy transaction shall be included with those of the substantive counts of

conviction to determine scale [amount]." Since the guidelines affirmatively direct the sentencing court to include relevant conduct in furtherance of the conspiracy offense when calculating the guideline ranges, and since there is absolutely no indication that Congress intended to prohibit the court's reliance on such conduct simply because it occurred prior to the guidelines' effective date, we find no merit to appellant's argument that the court improperly relied on drug deliveries which occurred prior to November 1, 1987, in determining his sentence.

■■■■ Moreover, the inclusion of cocaine deliveries which occurred prior to November 1, 1987, in determining the guideline range does not offend the Constitution. The *ex post facto* clause prohibits the enactment of laws which increase punishment for a crime *after* its commission. U.S. Constitution, Art. 1, Sec. 9, Cl. 3; *see Dobbert v. Florida*, 432 U.S. 282, 292, 97 S.Ct. 2290, 2297, 53 L.Ed.2d 344 (1977). Here, by contrast, the use of acts committed prior to its effective date had the effect of increasing Terzado's penal liability *during* the conspiracy's commission. *See United States v. Giry*, 818 F.2d 120, 135 (1st Cir.), *cert. denied*, 484 U.S. 855, 108 S.Ct. 162, 98 L.Ed.2d 116 (1987). Since conspiracy is a continuous crime, a statute increasing the penalty for a conspiracy beginning before the date of enactment but continuing afterwards does not violate the *ex post facto* clause. *United States v. Baresh*, 790 F.2d 392, 404 (5th Cir.1986); *See also White*, 869 F.2d at 826 ("Assuming that the guidelines proscribe a sentence for [a] drug conspiracy offense greater than the previous norm, the Ex Post Facto Clause ... is not violated by applying an increased penalty to [defendant's] conspiracy that *continued* after the effective date of the increased penalty.") (emphasis in original).

■■■■ Appellant also contends that the sentencing court should have applied the reasonable doubt standard, rather than the preponderance of evidence standard, in its determination of facts used for sentencing under the guidelines. Appellant argues that the Due Process Clause, as interpreted

in *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) and *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), prohibits the incarceration of any person based upon specific fact determinations which were not proven beyond a reasonable doubt. According to appellant, his due process rights were violated because the court's sentence was based on conduct proved only by a preponderance of the evidence. We disagree.

The Supreme Court in *Winship* held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364, 90 S.Ct. at 1072. In *Mullaney*, the Court held that the Due Process Clause "requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." 421 U.S. at 704, 95 S.Ct. at 1892. These two cases recognize that the prosecution must prove facts beyond a reasonable doubt at the adjudicative stage—that portion of the proceedings where guilt is established. The Court did not hold that the reasonable doubt burden must be carried as to all facts considered at sentencing, where only punishment is under consideration. In this case, unlike those cases, the lesser standard was utilized in determining sentencing and only *after* appellant had been adjudged guilty beyond a reasonable doubt.

It is well-settled that a defendant need not be accorded the same degree of due process protections during the sentencing phase as was required at the criminal trial. *See, e.g., McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986). As this court has recognized "[t]he sole interest being protected is the right not to be sentenced on the basis of invalid premises or inaccurate information." *United States v. Satterfield*, 743 F.2d 827 (11th Cir.1984), *cert. denied*, 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985). Recently, the Supreme Court has held that the preponderance of the evidence standard satisfies the Due Process Clause of the Fourteenth Amendment in the context of

state sentencing. *McMillan*, 477 U.S. at 91–92, 106 S.Ct. at 2418–19. Because we see no articulable basis for distinguishing in this respect a state sentence from one imposed in federal court, we hold that a federal defendant's due process rights are also satisfied by the preponderance of the evidence standard. *See United States v. Lee*, 818 F.2d 1052 (2nd Cir.) (adopting the preponderance of evidence standard for federal sentencing fact-finding), *cert. denied*, 484 U.S. 956, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987). *Compare United States v. Davis*, 715 F.Supp. 1473 (C.D.Cal. 1989) (application of sentencing guidelines violated due process by assigning weight to each factor without permitting adjustment to reflect relative uncertainty about the underlying facts.) In reaching this conclusion, however, we do not foreclose the possibility that at some future time and in some other context, we might require a higher standard of proof as a matter of policy.

■ Finally, appellant argues that a prior burglary conviction should not have been used to enhance his sentence because the state court that accepted the plea did not independently satisfy itself that a factual basis existed for the plea. Under Section 4B1.1 of the Sentencing Guidelines, a defendant is a career offender if, *inter alia*, he has "at least two prior felony convictions of either a crime of violence or a controlled substance offense." The presentence report indicates that Terzado has a 1983 conviction for possession of cocaine, and in 1979 he entered a plea of guilty to burglary with assault. The conviction for burglary of a dwelling is considered a "crime of violence" under Section 4B1.1 of the guidelines. *See* 18 U.S.C. Sec. 16.

At sentencing, appellant moved to exclude the burglary conviction from the guidelines' application because the state judge did not have a factual basis for the plea. The government introduced Terzado's state presentence report which contained the defendant's admission of the burglary and assault. The district court accepted this evidence, noting that Section 6A1.3(a) provides that the court may consider relevant information without regard to its admissibility provided that the information has sufficient indicia of reliability to support its probable accuracy. Moreover, the transcript of the plea filed in support of the motion to exclude the burglary conviction contains a stipulation by Terzado's attorney that there is a factual basis for the plea and that no formal inquiry by the court is necessary for purposes of making such a finding.

The Government argued that there was an ample factual basis due to this stipulation and the confirming admissions of the defendant. The district court specifically found that (1) there was no denial of a factual basis before the state court, and in fact the court made a special inquiry about it; (2) Terzado's lawyer was not incompetent at the time of the plea; (3) the defense made no showing that the Florida state court did not know what the factual basis was; and (4) there was no showing of any prejudice to Terzado.

■ Under Fed.R.Crim.P. 11(f), the judge who accepts a plea should independently satisfy himself that there is a factual basis for the plea. *See McCarthy v. United States*, 394 U.S. 459, 467, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969). As this court has recognized, "[r]equiring that the judge assure himself of the plea's factual basis is but one of several ways the rule ensures that a guilty plea results from a voluntary and intelligent decision." *United States v. Gomez–Gomez*, 822 F.2d 1008 (11th Cir.1987), *cert. denied*, 484 U.S. 1028, 108 S.Ct. 755, 98 L.Ed.2d 767 (1988). Appellant concedes that Rule 11 does not directly apply to the states. While the courts have not decided whether a factual basis is a constitutional requirement for accepting a plea, we find that the district court did not err in relying on the state burglary conviction because an adequate factual basis existed for the plea.

## CONCLUSION

Accordingly, appellant's convictions and the sentences imposed by the district court are AFFIRMED.