613 A.2d 440

**Michael Anthony BRUNO**

v.

**STATE of Maryland.**

**Nos. 1451, 1675, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Oct. 1, 1992.

502

504

James Wyda, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

David. P. Kennedy, Asst. Atty. Gen., Baltimore (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Joseph I. Cassily, State's Atty. for Harford County, Bel Air, on the brief), for appellee.

Argued before WILNER, C.J., and ALPERT and HARRELL, JJ.

WILNER, Chief Judge.

This is a consolidated appeal of two criminal cases tried in the Circuit Court for Harford County. On July 31, 1991, appellant was convicted by the court, on what was intended to be stipulated evidence, of first degree rape, for which he was sentenced to life in prison with all but 20 years suspended. A week later, he was convicted by a jury of solicitation to commit murder and obstruction of justice, for which he was given additional sentences, to run concurrently with the sentence imposed on the rape conviction.

Appellant complains in this appeal that the court erred:

(1) in both cases, by denying his motion to suppress certain admissions made by him to State agents; and

(2) in the solicitation/obstruction of justice case,

(i) by allowing his indictment with respect to the rape charges to be put into evidence in the solicitation case;

(ii) in commenting on the evidence;

(iii) in failing to instruct the jury on entrapment; and

(iv) in limiting his impeachment evidence.

Finding no reversible error, we shall affirm the judgments entered below.

### The Facts

In the early morning hours of March 29, 1990, the victim, Kimberly Wilhoit, met appellant and several of his friends at a bar and eventually left the bar with the group in appellant's limousine. Sometime during the ensuing ride

through Baltimore and Harford Counties, two of the men left the group, following which appellant parked the car and the three men remaining demanded sexual favors from Ms. Wilhoit. When she refused, two of the men held her down while appellant began to remove her clothing. Upon her protest, appellant used a stun gun to shock her. Thereafter, he, and apparently the others, engaged in several acts of vaginal intercourse and sodomy with Ms. Wilhoit, forcibly and without her consent. When this was over, they drove to a restaurant to have breakfast. Ms. Wilhoit complained to a waitress, and the police were summoned.

After his arrest, appellant was placed in the Harford County Detention Center to await trial. While there, he admitted to a fellow inmate, Norman Smith, that he had raped a woman—that he had forced a girl to have sex with him after a night of partying. Mr. Smith, either out of newfound religious convictions or in an effort to assist himself with respect to a pending violation of probation charge, relayed this information to Assistant State's Attorney Mark Nelson. Appellant later told Smith that he (appellant) "was trying to find a way of having the girl knocked off," to "[p]ut a hit man on her." Smith relayed that information as well to Mr. Nelson.

Upon receipt of this last piece of information, Nelson contacted Corporal Joseph Ryan of the Maryland State Police. Corporal Ryan called Smith, who told him that appellant was trying to get out of the detention center on reduced bond "to kill the girl who brought rape charges against him." Ryan told Smith to inform appellant that "you know a guy that would do the job." Corporal Ryan then made contact with Corporal Frank Walters, who worked with the "murder for hire unit" of the State Police. Walters told Ryan that, fortuitously, one Curtis Mack, who had served as an informant in a similar situation arising in one of the State correctional institutions, was in the process of being transferred to the Harford County Detention Center for his own protection. Arrangements were made to have Mack placed in the same cell block as appellant.

When Mack arrived at the detention center, he was told by Corporal Walters to keep his eyes and ears open but not to put any ideas into appellant's head. If appellant expressed interest in carrying out his plan to kill Ms. Wilhoit, Mack was to respond that he knew someone who could do the job. Mack was provided with a telephone number where Corporal Walters, using an alias, could be reached. In due time, appellant did indeed approach Mack regarding a plan to kill Ms. Wilhoit "to prevent her from coming to Court to testify against him." Mack told him to think about it for a few days, "to make sure this was what he wanted to do." When appellant confirmed his desire a few days later, Mack gave him Corporal Walters' number. Appellant eventually called Walters who, as planned, recorded the conversation. Appellant repeated his desire to have Ms. Wilhoit killed and a price of $1,500 was discussed.

### Suppression of Admissions

Appellant moved in both cases to suppress his statements to Norman Smith, Curtis Mack, and Frank Walters on the ground that they were obtained in violation of his Sixth Amendment right to counsel. In pressing this argument, appellant relies on *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) and some of its progeny. As we shall see in discussing those cases, a distinction needs to be made between admissions relating to the solicitation and obstruction of justice charges and those relating to the sex offenses.

In *Maine v. Moulton*, two defendants, Moulton and Colson, were charged by indictment with four counts of theft. Those charges were based on assertions that they had received and retained three vehicles knowing that the vehicles had been stolen. Both entered pleas of not guilty and were released on bond pending trial. After allegedly receiving certain anonymous threats, Colson decided to cooperate with the police. In a conversation with detectives, he admitted not only the offenses with which he and Moulton were then charged but also several other offenses. In

addition, Colson recorded three telephone conversations with Moulton and turned the tapes over to the police. Some of these conversations concerned the pending charges. Through a body wire, Colson later recorded an extended face-to-face conversation with Moulton in which the pending charges and the facts underlying them were discussed in considerable detail—"what actually had occurred, what the State's evidence would show, and what Moulton and Colson should do to obtain a verdict of acquittal." 474 U.S. at 165, 106 S.Ct. at 481. At one point in the conversation, the notion of "eliminating witnesses" was briefly mentioned but discarded quickly as unworkable; concocting false alibis was also considered.

Based upon these admissions, the State amended the indictment against Moulton to add some of the additional offenses he and Colson had discussed. Moulton moved unsuccessfully to suppress the recorded statements. At trial, the State offered only those statements recorded through the body wire that involved "direct discussion of the thefts for which Moulton was originally indicted" or discussion "about developing false testimony." *Id.* at 167, 106 S.Ct. at 482.

Citing its earlier pronouncements in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), *Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1958), and *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), the Court confirmed, 474 U.S. at 176, 106 S.Ct. at 487, the general principle that "the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." Applying that principle, it held that the State violated Moulton's right when it arranged to record conversations between him and its undercover informant, Colson. Addressing then the Solicitor General's argument as *amicus* that the statements should be admissible because the State had other, valid reasons for eavesdropping on the conversation between

Colson and Moulton—namely, to investigate Moulton's alleged plan to kill a witness and to insure Colson's safety—the Court agreed that the police have an interest in investigating both "crimes for which formal charges have already been filed" and "new or additional crimes." *Id.* at 179, 106 S.Ct. at 489. It understood as well that, in investigating a person suspected of committing one crime and formally charged with committing another, the police "obviously seek to discover evidence useful at a trial of either crime," but concluded nonetheless that "[i]n seeking evidence pertaining to pending charges, however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused." *Id.* at 179–80, 106 S.Ct. at 489. In that regard, the Court continued, at 180, 106 S.Ct. at 489;

> "To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel.... On the other hand, to exclude evidence pertaining to charges *as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained,* simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. Consequently, incriminating statements *pertaining to pending charges are inadmissible at the trial of those charges,* notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel."

(Emphasis added.)

In an important footnote to that last sentence, the Court added, "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial *of those offenses."* (Emphasis added.) *Id.* at 180 n. 16, 106 S.Ct. at 489 n. 16. The Court confirmed that statement in *Moran v.*

*Burbine,* 475 U.S. 412, 431, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986), where, in discussing *Moulton,* the Court stated that it had "made clear ... that the evidence concerning the crime for which the defendant had not been indicted— evidence obtained in precisely the same manner from the identical suspect—would be admissible *at a trial limited to those charges."* (Emphasis added.) *See also McNeil v. Wisconsin,* —— U.S. ——, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991).

The same point was made in *U.S. v. Terzado–Madruga,* 897 F.2d 1099 (11th Cir.1990). There, as here, the defendant was in jail awaiting trial on charges for which he had been indicted when the police received information that he was attempting to have one or more persons murdered. The government arranged to tape a conversation between the defendant and the hit man that produced damaging admissions regarding not only the contemplated murders but the pending charges as well. The defendant was subsequently charged with three additional counts under the Murder for Hire statute which, in an effort to avoid problems under *Moulton,* were severed, and the defendant was tried only on the original charges. Upon his conviction, Terzado–Madruga urged that those charges should have been dismissed due to prosecutorial misconduct, part of that misconduct being the surreptitious recording of his telephone conversations in deliberate violation of his Sixth Amendment rights.

Addressing that issue, the Court held that the government did indeed transgress upon the defendant's right to counsel, in the words of *United States v. Henry, supra,* 447 U.S. at 274, 100 S.Ct. at 2189, by " 'intentionally creating a situation likely to induce [an accused] to make incriminating statements without the assistance of counsel.' " 897 F.2d at 1109. That was true, the court declared, citing *Moulton,* "even where the government expressly instructs its informant not to initiate any conversations with the accused and not to question him regarding the pending charges." *Id.*

In determining what to do about the violation, the court, quoting in particular note 16 in *Moulton,* held that,

"[U]nder the teachings in *Maine v. Moulton,* it is clear that Terzado's recorded conversations obtained in the unlawful interrogation must be excluded from his trial of the drug-related charges, as the lower court recognized. Likewise, there is little doubt that Terzado's incriminating statements pertaining to the murder-for-hire scheme, as to which the Sixth Amendment right to counsel had not yet attached, would be admissible in a subsequent trial *limited to those charges.*"

*Id.* at 1111 (emphasis added).

The Court expressly rejected Terzado's further argument that the tainted evidence should be inadmissible at *any* trial because it was illegally obtained and that exclusion was necessary to "preserve judicial integrity" and deter further misconduct. It said, in that regard:

"As the Supreme Court has recognized, when a defendant's right to counsel has attached for one crime, he is not insulated against interrogation as to other crimes, notwithstanding the absence of counsel [citing *Moran v. Burbine*]. To hold that the government is prohibited from investigating the defendant's involvement in new crimes, simply because his right to counsel has attached for a separate offense, would be essentially to immunize a defendant from further prosecution. Indeed, in the context of this case, such a holding would be tantamount to declaring 'open season' on government witnesses. The Sixth Amendment has not been interpreted to provide a cloak of immunity for a defendant during the pendency of an indictment ... nor to provide a right to consult counsel for advice on committing crimes. This is especially true where the offense under investigation is a new or ongoing one, such as illegal efforts to thwart the forthcoming prosecution."

*Id.* at 1111-12.

*See also U.S. v. Batista,* 834 F.2d 1 (1st Cir.1987); *U.S. v. Nocella,* 849 F.2d 33 (1st Cir.1988); *Alexander v. State of*

*Conn.,* 917 F.2d 747 (2d Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2831, 115 L.Ed.2d 1000 (1991); *U.S. v. Payne,* 954 F.2d 199 (4th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 1680, 118 L.Ed.2d 396 (1992); *U.S. v. Cooper,* 949 F.2d 737 (5th Cir.1991); and *U.S. v. Britt,* 917 F.2d 353 (8th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 971, 112 L.Ed.2d 1057 (1991), applying the same distinction and allowing statements regarding uncharged crimes made to a government agent by a defendant then under indictment for other offenses to be used at a trial for the subsequently charged crimes.

Appellant relies principally on *U.S. v. Micheltree,* 940 F.2d 1329 (10th Cir.1991), which reached what he regards as a different, better reasoned, and more favorable conclusion. *Micheltree* was an unusual case. The defendant had been indicted for a variety of offenses arising out of her allegedly having distributed a controlled substance known as MDMA. She was released pending trial. One of the written conditions of the release was that she was to avoid all contact with potential witnesses, although there was some question whether she was aware of that condition. At some point, she called Rizzo, who had been part of the distribution network and was a potential witness, and inquired whether Rizzo had been contacted by detectives. Initially, Rizzo replied that she had not been so contacted, but, in a subsequent call from Micheltree, Rizzo replied that she had been called by a detective. Micheltree thereupon arranged to meet with Rizzo, ostensibly for Rizzo, a hairdresser, to give Micheltree some sort of hair treatment. Rizzo, concerned, called the detective, who arranged with Rizzo to have the conversation taped. The purpose, according to Rizzo, was to see if Micheltree would try to change Rizzo's testimony in the case. The meeting occurred, and the conversation was taped; in it, Micheltree, at Rizzo's urging, discussed her views about the government's case and advised Rizzo to make the government subpoena her if she was to testify.

Following this conversation, Micheltree met with her pretrial services officer who, having been alerted that Micheltree was attempting to see a potential witness, inquired whether she had been in contact with any potential witnesses. Initially, Micheltree denied any such contact, but upon being informed that the officer had contrary information, Micheltree admitted having seen Rizzo who, she claimed, was her regular hairdresser. Micheltree denied having discussed the case with Rizzo. Both of those statements were untrue; Rizzo was not her regular hairdresser and they had, of course, discussed the case.

As a result of Micheltree's contact with Rizzo and her dissembling with the pre-trial services officer, the government added a new count to the indictment, charging Micheltree with knowingly engaging in misleading conduct with the intent to hinder the communication by a pre-trial services officer to a law enforcement officer or judge of information relating to the commission of a Federal offense, in violation of Title 18, U.S.C., § 1512(b)(3). Although characterized as a "witness tampering" count, the government made clear in a bill of particulars that the gravamen of the offense was Micheltree's having lied to the pre-trial services officer about the frequency and nature of her contact with Ms. Rizzo rather than any direct attempt to tamper with Rizzo's proposed testimony. The taped conversation with Ms. Rizzo was the critical evidence establishing that what Micheltree told the pre-trial services officer was untrue or misleading.

Ms. Micheltree was convicted on two counts related to the distribution of the drug as well as on the new count. Although no objection was made at trial to the admission of the tape recording of the conversation with Ms. Rizzo, that admission was raised as plain error in the appeal. Because it chose to reverse the convictions for the drug offenses on other grounds, the Court did not reach the question of whether the admission of the taped conversation constituted plain error as to those counts. It did recognize plain error with respect to the added count, however, holding it to be so

closely related to the drug counts, for which she was under indictment at the time, that the Sixth Amendment violation made the evidence inadmissible as to the added count as well. At 1344, the Court observed: "What the government asks us to do is to allow use of the uncounseled statements on the MDMA counts to prove that the defendant's subsequent account of those statements to the pretrial services officer was false. This we will not do."

The Illinois Supreme Court reached a similar conclusion in *People v. Clankie*, 124 Ill.2d 456, 125 Ill.Dec. 290, 530 N.E.2d 448 (1988). The defendant there had been convicted on two counts of burglary arising from break-ins occurring at the same place on June 11 and 14, 1984, but a new trial was ordered due to a conflict of interest on the part of his attorney. Pending the new trial, a defense witness decided to cooperate with the State and permitted a conversation with Clankie to be taped. During that conversation, Clankie admitted to a third break-in, at the same place, on June 27, as a result of which a new charge was added. The court declared the tape inadmissible as to all charges, including the new one. Relying on *Moulton*, but without citation to or apparent regard for *Moran v. Burbine, supra*, 475 U.S. 412, 106 S.Ct. 1135, the Illinois Court stated, 530 N.E.2d at 452, that "[t]he United States Supreme Court has thus apparently assumed that sixth amendment rights of one formally charged with an offense extend to offenses *closely related to that offense* and for which a defendant is subsequently formally accused." Reviewing that case, the Fifth Circuit Court of Appeals in *U.S. v. Cooper, supra*, 949 F.2d at 744, noted that "all the charges in *Clankie* were *extremely* closely related, involving the same crime of burglary, victim, residence, time span, and sovereign."

 We do not have a *Micheltree* or *Clankie* situation here. The new charges filed against appellant were not at all closely related to those for which he was already under indictment. Indeed, the only connection between them was the fact that he was attempting to defeat the pending charges by killing the State's principal witness. As we

interpret *Moulton*, in the light of *Moran*, appellant's statements to Messrs. Smith, Mack, and Walters regarding his desire or intent to have Ms. Wilhoit killed were admissible in the separate trial for solicitation and obstruction of justice.

■ To the extent that those statements were obtained in violation of appellant's Sixth Amendment right to counsel, they would not, of course, be admissible in the trial for rape. We then have to examine just what was admitted at that trial.

As we indicated earlier, the rape case was presented and decided on what was intended to be stipulated evidence.[1] It seemed to be the understanding that, with respect to the statements made by appellant to Smith, Mack, and Walters, the court would consider the testimony it had heard at the suppression hearing, as supplemented by the prosecutor's statement. As to Smith, the prosecutor said simply that "Mr. Bruno admitted to a fellow inmate by the name of Norman Smith, that he had raped Miss Wilhoit." That is consistent with, but no more than, what Smith had testified to at the suppression hearing with respect to the sex offenses. Appellant gives us no reason why Smith's testimony, to that extent, should have been suppressed. There is nothing in this record to indicate that Smith was in any way a State agent when that statement was made or that he had encouraged or solicited the statement, directly or indirectly, on behalf of the State.

Notwithstanding the State's argument to the contrary, we think that Mack *was* a State agent, as was Walters, and that they obtained statements from appellant in contravention of his Sixth Amendment rights. The test, as summarized in *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 2630, 91 L.Ed.2d 364 (1986), is this:

---

1. This was clearly the intent of the parties, although from the actual recitation of what occurred, it appears that there was an agreement as to ultimate fact. We shall treat the case as one of stipulated evidence, however.

"[T]he primary concern of the *Massiah [v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)] line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since 'the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached' ... a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks."

In *Moulton,* the Court equated with "beyond merely listening" the "knowing exploitation by the State of an opportunity to confront the accused without counsel." 474 U.S. at 176, 106 S.Ct. at 487. In this regard, Mack's status is markedly different from that of Smith. Smith had no prior arrangement with the State and made no effort to elicit or encourage any statements from appellant. He was "merely listening" and reporting what, by happenstance, he heard. Mack, on the other hand, was deliberately placed in appellant's cell block by the State with full knowledge that appellant was actively looking for someone to kill Ms. Wilhoit. He, in particular, was placed there because he had performed a similar service for the State on an earlier occasion. Moreover, his role was not merely to listen and report. He was also instructed, in the event appellant made an overture, to give appellant Walters' telephone number, which he did, and in so doing, caused further incriminating statements to be elicited.

Mack's testimony, however, both as given at the suppression hearing and as proffered at trial, did not include any statements made by appellant with regard to the sex offenses. To the extent that it revealed a desire or plan to kill Ms. Wilhoit, it could, of course, be taken as a

consciousness of guilt and thus as evidence of guilt, and, as such, it should not have been admitted. The statement was obtained in violation of law and was inadmissible to show guilt of the sex offenses, directly or indirectly.[2]

■ Under the circumstances, however, the error was clearly harmless, beyond any reasonable doubt. The court had before it uncontroverted stipulated evidence that,

"Mr. Bruno obtained an electronic stun gun device that delivers shocks of relatively high voltage of electricity, and shocked [Ms. Wilhoit] with it on her bare skin numerous times.

While she was being held down by his companions and after the weapon, which she perceived to be a dangerous and deadly weapon, was used upon her, she submitted, and Mr. Bruno engaged in forceful vaginal intercourse with her forcefully, and against her consent, while the two companions were assisting in subduing her.

Other sexual acts took place, all against her will, and without her consent. There were several acts of sexual intercourse, acts of sodomy, and battery."

In light of this stipulated evidence, other statements having no relevance beyond indicating a consciousness of guilt could not possibly have influenced the court's verdict in any way.

■ The same principle holds true with respect to Corporal Walters' testimony and the recorded statement that was admitted. Both were inadmissible at the rape trial, but under the circumstances the error, in our view, was harmless. Unlike the situation with Mack, appellant did make some comments in his statement to Walters about

---

**2.** At oral argument, the State urged that because Mack's testimony related only to the solicitation and did not include any admissions by appellant regarding the sex offenses, its admission at the rape trial did not contravene appellant's Sixth Amendment rights. We do not agree. *Moulton, Moran,* and *Terzado–Madruga* make clear that statements pertaining to uncharged crimes are admissible only in trials *limited to those crimes.*

the episode with Ms. Wilhoit. At one point, he gave Walters a brief physical description of Ms. Wilhoit indicating that he had seen her bare-breasted. In his only specific references to what occurred, he told Walters first that

"she kinda played us, then she got it, then she got ripped, after all that went down she demanded more and I told her hey, that was on you that wasn't on me, you went to your people and got that, and you know. So that's you know the reason I'm here."

A little later, he added, "[s]he wanted to go with us so bad, she was like acting that she wanted to kill for it." The rest of the conversation was either innocuous or dealt with enlisting Walters' aid in killing the victim.

Appellant had never denied having sexual relations with Ms. Wilhoit. Up to the point of agreeing to the stipulated testimony, his defense was that the sexual contact was consensual and that Ms. Wilhoit had claimed rape only when he refused to pay her money. The statements made to Corporal Walters, to the extent they referred to the events of that evening, are wholly consistent with that defense and, indeed, detract from rather than support the otherwise uncontradicted recitation by the prosecutor, noted above. By finding appellant guilty of rape, however, the court necessarily disregarded those parts of appellant's statements relating to the episode with Ms. Wilhoit. The incriminating value of the statements, if any, thus goes at best to a consciousness of guilt, but even that is tenuous. Read as a whole, the statements show not so much a consciousness of guilt as simply a desire to get out of jail and escape the prosecution.

For these reasons, we find that any error in admitting or considering the recorded conversation or the testimony of Corporal Walters was harmless. *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); *cf. Arizona v. Fulminante,* 499 U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

### Admission of the Indictment

█ In the solicitation/obstruction of justice case, the State, over appellant's objection, placed into evidence the 15–count indictment returned in the rape case. Appellant acknowledges the relevance of showing that he was facing serious charges when he enlisted assistance in killing Ms. Wilhoit, but he urges, in light of his offer to stipulate that he had since been convicted of rape or that he was facing a 15–count indictment that included a charge of rape, it was error to place before the jury the entire indictment. We disagree. As the prosecutor pointed out, it was relevant for the jury to know the full extent of the charges facing appellant at the time and not that he was just charged with, or later convicted of rape, or that other undefined charges were also pending. The indictment was in standard form and did not contain any lurid details of the various offenses. Moreover, the court instructed the jury that the indictment was not evidence of appellant's guilt but was admitted only to show the circumstances at the time of the alleged solicitation. We find no error.

### Comment on the Evidence

█ Appellant's next complaint is difficult to follow. In the course of cross-examining Corporal Walters with regard to the recorded conversation, counsel was apparently attempting to show that appellant had not used the word "kill" in one particular part of the statement. Walters had previously expressed his belief that, considering the conversation as a whole, appellant was seeking to have Ms. Wilhoit killed, but counsel insisted on focusing on the one particular statement of appellant. At that point, the State objected and the court sustained the objection, remarking that "[y]ou can ask questions but you can't control how he answers." Counsel complained that the witness was not being responsive to the question, to which the court responded, "If you will ask him read the next sentence, I will ask him to read the next sentence. I won't tell him what

this means. I don't think you want me to get involved telling the jury what it means."

Appellant now construes these remarks by the court as implying that his interpretation of the conversation was incredible. We see no reasonable basis for such a construction.

### Instruction on Entrapment

As part of the defense case, appellant presented testimony from Clarence Burdick, who had been an inmate at the Harford County Detention Center when appellant, Smith, and Mack were there. Burdick stated that there were a number of confrontations between appellant, Mack, and some other inmates arising from appellant's frequent use of the telephone. On one occasion, there was a fight in which several inmates were involved in beating appellant. According to Burdick, when the fight was over Mack "says for Mr. Bruno to do what he was supposed to on the telephone. I didn't know what that meant, or anybody else, but there is a lot of people that heard it." Appellant, himself, did not testify, and there was no further elucidation of what actually occurred, or the context in which it occurred.

From this bit of gossamer, appellant constructs the notion that Mack, as a State agent, forced appellant to call Walters. That, in turn, is the premise for his request for an entrapment instruction. The court denied the instruction because there was insufficient evidence to support it, a conclusion with which we heartily agree. Apart from the positive insufficiency of Burdick's testimony on direct examination, on cross-examination he stated that this event occurred at a time that was long after appellant had, in fact, called Walters, and so it could not have had any reference to that call.

### Limiting Impeachment Evidence

Appellant's final argument also concerns the testimony of Mr. Burdick. In a supposed effort to impeach the

testimony of Mack (and presumably Smith as well) that appellant was actively seeking someone to kill Ms. Wilhoit, counsel asked Burdick whether *he* had ever heard appellant say that he wanted Ms. Wilhoit killed. Those questions were disallowed on the ground that, as posed, they were leading. Counsel then asked what else Burdick heard appellant say with respect to Ms. Wilhoit, and the objection to that was sustained on the ground that it called for hearsay. In this appeal, appellant does not challenge these rulings on the specific grounds raised by the State in its objections— whether they were leading or called for hearsay—but rather on the basis that the court prevented him from impeaching the testimony of Mack.

Apart from the fact that that ground was not raised below, we find no basis for the complaint. Appellant failed to establish that Burdick was in a position to know what appellant had said throughout his confinement at the detention center. Testimony that *he* never heard appellant say anything about killing Ms. Wilhoit would not indicate that appellant had never made such statements; nor would testimony that appellant had said other things about Ms. Wilhoit indicate that he had not also said that he wanted her killed. In short, if the purpose of the testimony was to show that appellant had not, in fact, made the statements testified to by Messrs. Smith and Mack, it lacked a proper foundation.

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.